Good morning, your honors, and it's my privilege to be here. May it please the court. I'm Gerard Fox, and I represent the appellants, Cy B. Etoffe. Before I answer your questions and before we get into the law, I think it's important in the circumstances of this appeal to understand that EB-5 is a program set up to induce foreigners to stimulate our economy, with no enforcement mechanism attached to it of any real significance. Our clients, I think it's undisputed, presently stand without a penny of the money they invested, and face deportation with their families that they moved here in reliance upon a program that was marketed to them. This is their only recourse. The complaint that was dismissed with prejudice was a 60-page complaint full of very specific allegations and details. This is after the first dismissal was perfunctory and really almost didn't inform us as to the basis for it. Also, Mr. Rodham has joined the brief of Mr. McAuliffe but really did not represent or present his own appeal, and their brief doesn't cover the following, which is any claims against Rodham as to aiding and abetting breaches of fiduciary duty and accounting claims, as to fraud and breach of fiduciary duty claims asserted against both defendants. The alleged misrepresentations by McAuliffe on the one hand and Rodham and Gulf Coast and entity he controlled on the other are different. As such, the following arguments as to Rodham are unopposed. Alleged misrepresentations were sufficiently particular. Alleged misrepresentations are actionable. Allegations of control over Gulf Coast and Greentech are sufficient to attribute their statements to Rodham. Reasonableness of reliance sufficiently alleged, and sufficient facts demonstrate scienter. First of all, there was sufficient particularity. Specific misrepresentations that were alleged, district court failed to reach most of them. Sanford v. Atkins makes clear you must analyze all of the allegations when measuring particularity. The complaint at paragraph 73 through 76 states that McAuliffe represented both to the investors as a group and on national television that Greentech sold 11,000 cars. Patently false. Let's just stick with that. That's a good example. That was done, what, in an interview in a Washington television station? Also, they went on road shows. He made those representations there through an interpreter to large groups, including our clients, and followed up in newsletters. I thought the allegation was that he did that in a news story, in an interview. Actually, if you go on to paragraph number, let's see if I have it here. Yes, paragraph 70 talks about the road shows in China. A lot of the statements were made, were sort of mass media statements made in the United States. And in China, Your Honor, we allege that they went to China on road shows and spoke to groups of people, including our clients. Excuse me, and I don't mean, I mean, do you allege that your clients were in one of those groups to whom, who were in one of the groups at one of those road shows where the statements were made? I had a little trouble tying that together. Don't spend a lot of time on it. You can look when you sit down. But I was trying to. Yeah, we allege and define our clients as the investors. My question is pretty, pretty narrow. I'm trying to connect dots. And in that instance, I did not connect the dot between your clients hearing in in China, other than through a mass media presentation that some of the representations. But don't I don't want you to take a lot of time. Beauregard's going to do the rebuttal and I'll make sure she brings that to your attention. You know, also, you have to understand, Mr. McAuliffe, the former governor of this state, was brought into meetings where our client was present and got on national news media and also spoke to Chinese reporters, which we also allege in here. Now, there is an imprimatur of believability. Excuse me, counsel. Yes. I think that Judge Duncan at least raised a question in my mind that I had. Granted, we can grant you that the statements were made. But were they heard or were they relied upon? For example, in your complaint, with respect to the plaintiffs, it reads that so and so invested $500,000 at such and such a date. And it doesn't indicate in the listing of those names that so and so heard the interview or was at the meeting or whatever. In other words, shouldn't the investment have been connected to hearing the alleged false statement? Your Honor, first of all, citing Smith v. McCauley and Harrison. In Smith, the prevailing wage dispute on federal construction projects, the court analyzed the sufficiency of fraud allegations without demanding allegations of reliance other than the misreps caused payment of improper wages. Now, in this case, it's undisputed that our clients invested in Green Tech. Mr. McCauley owned Green Tech singularly with Mr. Wang. I believe it's Mr. Wang. And so at the end of the day, my clients who are in China on the other side of the coast end up investing in this program, not another of the other hundreds of programs, this program, and part with $500,000 that goes into Green Tech. Please do let us finish our sentences. Thank you so much. I grant you that they invested in Green Tech. And let's assume for purposes of the 12B6 motion that the statements were made. But did they hear the statements and what role did they play in the investment? Again, I believe, Your Honor, and again, I'll have Ms. Bogorod address this. Our complaint is full of statements that our clients heard these representations. Let's go back to the one statement. You know, this is a good typical example. Here you have in paragraph 73, during a CNBC news segment that aired around November 11, Mr. McAuliffe stated they have sold 11,000 cars, et cetera. And you say that was false. Yes. Now, the question is, where do you allege that that statement there was made to any investor, that any investor heard that statement and relied on that statement in order to make the investment? Again, I'll cite you, Smith, McCauley, and Harrison. No, no, no. I want you to know in the complaint. I'm asking you, in the complaint, where do you show that any investor heard that statement, relied on it? Well, Ms. Bogorod will give you precise sites. Well, this is a complaint. You know the complaint, don't you? Yes, we drafted it, but it's 60 pages long, Your Honor. I know. I've read the whole complaint, and I've got it documented here, and I'm just looking for a place where you say any investor heard that statement and relied on it. I'll have to have Ms. Bogorod answer that in rebuttal. I believe the complaint is rife with that. Well, it's not rife. That's why I'm asking you. I'm asking you just a simple question. Respectfully disagree. You had four statements attributed to McAuliffe. And all four of them are stated in there. And one of the important ones that you rely on is that they had manufactured 11,000 cars, and that was said in a CNBC television interview. And the question is, we don't even have what was said in the interview. Well, we do. We have a quote. But then we don't have anybody watching it. We don't have anybody who relied on it and said, oh, that tipped my scales. I gave up $500,000 when I heard that. Your Honor, I would refer you to the amendment, page 20C. What paragraph? We have sites of record here. Again, I'll have Ms. Bogorod give that to you. But I believe, you know, we have a claim to specify how they received each of the statements that were sent to them, summarizing all of the same allegations that were made. Where? Where is that? Paragraph 73 through 76. Well, that's what I'm just at. It doesn't say that. They pled that they reviewed each statement and relied on each statement. Where? Paragraphs 103 to 105. Each statement in the offerings? That's the only thing that's said they got. They got the offering statement? Correct. The offering statements, the news statements. But the offering statement says just the opposite. The offering statement says they hadn't even built it. They said it was in the development stage. Your Honor, there are two different statements. One was in Chinese. One was in English. The English is very different than the one that was in Chinese. Was the prospectus and the private placement memorandum, were they ever translated into Chinese? They were different. They sent the Chinese, the statement in Chinese that had most of the information that you would want and that would warn them or was honest, removed. Did you, did your, are you saying, I'm not quite sure what your answer is. Did you translate, the statements were different. Did your clients have the statements, all the statements that were made available translated so they could read them? They never received the statement that was in English. That was different. It was handed out in different places, but they made sure that they changed the document so that the Chinese would, if you're Chinese and you get a document that's given to you, it's the only document given to you. It's in your own language. Where's all this alleged in the complaint? Yes. Where? That they were given the offering documents in Chinese? Yes, I believe that's also. Yeah, I thought you alleged just the opposite. You said they were never translated. And what about the. . . Can I just have an answer to this question? I know for a fact that the two, there were two different documents and again. . . I don't believe so. What about there was a private placement memorandum and a limited partnership agreement that were provided? Correct, but these were different. There were two different versions, one in Chinese, one in English. Where's the Chinese? I just asked you whether there was a Chinese. You said there wasn't. Well, no, the document, there wasn't an interpretation of the agreement. Somebody intentionally and fraudulently gutted the provisions that they would later rely on in court from the Chinese version. You don't allege that. You said there were no translations made in the complaint and that they didn't basically speak Chinese. They didn't speak English. Didn't speak English. Didn't speak English. Correct, but. . . And they didn't translate. There were two different documents that were created. Look, the governing documents are not a mystery. The governing documents are the offering statement and the limited partnership agreement, as well as, there were five documents. And they were given those documents and signed them. Yes. And those were that governed the investment. Now, my first question was, were any of those documents translated into Chinese? And you said no. That's correct. And the second question is, did they read English? I don't know the answer to that. I guess you rely on the fact that they didn't understand English. They needed Chinese. Most of them do not speak a word of English. But you state that they were provided with documents such as the private placement memorandum and the limited partnership agreement in English and that they did not read them. That's right, because they couldn't. And they were, well, doesn't that go to the reasonableness of a reliance that people who are invested a half a million dollars don't pay some of that money to have a private placement memorandum and a limited partnership agreement that they sign translated into a language that they can read? The gravamen of most of your, the allegations in your complaint is that reliance be reasonable. Well, first of all, the case law is very clear that reasonable sort of reliance is a factual question. And you're really getting there. Please stop. Please. They signed documents that they did not read. Correct, because the governor of the state showed up in front of them, which is very different than just the average person, and said, I guarantee you, and it's in our complaint, that you will get your visa card. Where is that in the complaint, that he stood in front of them? Again, it's in paragraph 70 through. Well, there's four, beginning with 73. There are four statements attributable. Yes, and they went on road shows and talked to them. And we have elsewhere in the complaint that they guaranteed the investment. No, no, no. Just a minute. Just a minute. This is the problem with your complaint. This is the problem with your answers. We have four statements in paragraph 73, 74, 75, and 76 attributed to McAuliffe. And none of them are where he stood in front of the investors and told them these things. If you take the complaint as a whole and you understand the allegations, it's clear that were made by our clients. We are the investors we're talking about. He was in front of our clients. In an interview, here's another one. In an interview, this is the fourth one, NBC 12, that aired on or about December 5, 2012, Mr. McAuliffe publicly stated that Green Tech had 1,000 employees. And you say that's false. Correct. Now, my question is, again, was that statement made to your investors and did they rely on that statement in the complaint? We state repeatedly that the investors relied on these statements. It's clear that we're writing about the things that our investors heard or that we're told about. And I think reasonableness and reliance is also a factual issue. We're talking about this at the early pleading stage. Let me ask you this. Did they receive any document in Chinese governing this investment? Yes. What document? It was another prospectus, but it was radically different from the one in English. Where is that alleged in the complaint? That I don't know if it's alleged in the complaint. I don't think it is.  So, anyhow. All right. Thank you, sir. Thank you. Mr. Elias, we're pleased to hear from you. Thank you, Your Honor. May it please the Court. Let me first begin by thanking you for extending me the courtesy of appearing before you today. I live in the Commonwealth of Virginia, but I practice in Washington, D.C., so it's always good to come to Richmond and be here. To reverse the District Court's decision, this Court would have to find the 27 different plaintiffs, some of whom spoke English, although it sounds like most didn't, who didn't bother translating or understanding legal documents, including the Partnership Agreement and the Private Placement Memo, each of whom subscribed on different days and presumably for different reasons. Were they in different places when they signed? We don't know. China's a big country, but part of the problem with this case is that we know very, very little, if anything, about exactly what the plaintiffs understood the facts to be and what role Mr. McAuliffe played in their understanding. Your Honor, Judge Duncan, you wrote the opinion in McCauley v. Home Loan Bank in which you laid out four reasons why Rule 9b pleading requirements are heightened. The first is to provide fair notice of claims against the defendants and factual grounds upon which they're based. The second is to forestall frivolous suits. The third is to prevent fraud actions in which all the facts are learned only following discovery. And finally, to protect defendants' goodwill and reputation. I was going to address it in those words, but let me jump to the last one because I think it may be the elephant in the room. Mr. McAuliffe was not the governor of Virginia at the time of the facts in question. It was before he'd run for governor. Yet that has not stopped plaintiffs from continually to refer and to blur as if somehow the fact that he became the governor of Virginia later was relevant to the subscription decisions and the investment decisions made by these 27 individuals. That is presumably the reason why plaintiffs issued press releases upon filing their complaint prior to serving them, highlighting the fact that Governor McAuliffe, now Governor McAuliffe, was involved. Well, the difficulty here from the complaint is that you have this very long list of investors. They all invested $500,000. But with respect to each of those investors, there is no reason given as to why they invested or what led them to invest or what statements they heard that led them to invest or what have you. We're left with the bare fact that there was an investment decision made, but we're not told why it was made. And the concern, I think, that the Supreme Court has with these cases is that investment encompasses an element of risk, and it's all too easy after an investment goes sour to blame it on those who were promoting and sponsoring the investment. And, you know, there are times when fraud does enter into it, but part of that is that you have to show reasonable reliance, and in addition to those names that are mentioned without any particular tie-in or link to what statements not even one of them heard. And then you have the limited partnership agreement and the prospectus and the private placement memorandum. I'll come back to Judge Niemeyer's question. I don't understand that those were translated into Chinese, which I think would have been helpful to the respective investors if they were to invest half a million dollars into it. And you just don't – there were no – this is sort of a – there were no face-to-face meetings that are related really in the complaint. And as far as I understand it, the private placement memorandum indicated a speculative nature of the investment, and I would think that the investment was by nature speculative in that you were talking about something on the cutting edge at that time of automotive technology, which were electric cars, and they were trying to get in ahead of the curve. So just even the – I think the private placement memorandum said it develops a company in its developing stages. But it would seem to me that it would be – if you were a reasonable investor, you would say, whoa, this is on the cutting edge. This contains a significant element of risk. That's the problem from the standpoint of the other people's case. The problem from your side, I suppose, is that the comments that were made about the number of cars that Denmark had contracted for and the number of employees that you have, if we were to take those in truth, don't they go beyond puffing and mistake facts about the company's prospects itself? They don't, Your Honor. Why not? And I think that the isolation of these four statements illustrates that the case being brought here fails not even worse than, I think, Your Honor laid it out. Let's just table set here. These are four statements that were all made in England. One was made on a local PBS station in Richmond. One was made to a local NBC affiliate in Richmond. One was made on the English language version of CNBC. Notice CNBC actually has CNBC Asia. This wasn't made in CNBC Asia. This was actually made CNBC in New York in English. And the suggestion is – Why would you make a statement if they weren't true? I mean, didn't the statements just at face value about Denmark's purchase of cars and the number of employees and the fact that Gulf Coast was going to guarantee the financial health of Green Tech, didn't they run ahead of the facts? So, to be clear, the last statement is not one attributed to Governor McCullough about guaranteeing. With respect to Denmark, what was said, according to the complaint, is that the first-year production of electric cars would be sold to the country of Denmark. So it's forward-looking. And this Court has held in a number of cases that forward-looking projections do not constitute actionable fraud. But it almost implies you have a contract in hand. Well, but almost implying is a long way from – It suggests you have a contract in hand. I mean, I think that the opposing case is very weak on the question of reasonable reliance. And that's a critical element here. But I'm just asking you about the statements that were made. I don't – it goes to a different element of the securities fraud. But I'm not sure that they can just totally be dismissed as puffing. Yeah, and I guess, Your Honor, when you compare it to the statements that this Court and other courts have found actionable and not actionable, I would argue that it's not just that it's puffing, but that they're forward-looking statements. No, no, no. That's not a good answer. I don't know what the right answer. It might be reliance, or it might be they didn't hear them. But to say we have 1,000 employees, to say that we have sold 11,000 cars, we have only sold 11,000 cars, but it's still a new business for us. That's the quote. Now, that's not forward-looking, is it? So, again, if I can answer the first statement. No, stick with the second one. It's easier. Okay, because I think the first one – We have sold 11,000 cars, but it's still a new business for us. Yeah, I think that if you look at that statement in context, which I realize all you have is the snippet of the quote. But even the snippet of the quote gives you a sense of the context, that he is actually downplaying the success of the company. These are actually statements of warning about the speculative nature of the company. He's saying, we have – That's a really nice spin, but it's hard to swallow. You know, I mean, we've only sold 11,000 cars. Sounds like this is the worst-case scenario. We're a brand-new company, but we have sold 11,000 cars, so think what the upside is like. I appreciate and understand your point of view, the argument that you're making, but that, to me, is unhelpful. I think that – let me, Your Honor, let me take a step back and address it this way. There are no cases. The Deepwater Horizon case stands out as perhaps the one exception. There are no cases where statements, where purely statements to the media, purely public pronouncements of this kind of fact is sufficient. Well, let me ask you this. What if we have clear reliance, we have these statements paraded out in multiple newscasts by the owners, and they're telling them, and this investor is sitting in the living room listening to this, saying, wow, wow, I'm going to buy some of that. The question is, can that be puffing anymore? And your best argument might be that the prospectus and the offering documents control the investment, and they should read that. But these statements are pretty aggressive. Judge Niemeyer, I think the question is not just whether or not the offering documents control, but is it reasonable? They contradicted this. The representation you made was that they contradicted it. They do contradict it. See, to my view, there are no halos in this case. I think the opposing counsel has a terribly weak argument with respect to reliance, but I think you're trying to spin things as puffing and the rest that strike me as a bit aggressive. Now, you've got two qualifiers to it. One is the one that Judge Niemeyer made, which is the fact that the offering documents and the limited partnership agreement are the controlling documents in the investment. And also these statements were made in a very local market in English. And so, you know, that may not make them as egregious. And it really goes. But the fact that they were made in a limited market and the fact that the offering documents control, that goes to the reasonableness, the unreasonableness of reliance. That goes to the weakness of reliance. That doesn't go, you know, to absolving you. These were, in my judgment, I don't think they're fatal, but it bothered me that you were claiming that these were puffing when I think they went significantly ahead of what the facts were. So, Your Honor. They weren't just projections. Right. Your Honor, I think that in some sense, though this case is properly dismissed under Rule 1286, where we've moved beyond the threshold question of whether or not it was pledged sufficiently under 9b, which doesn't rely one way or the other on whether those statements were puffing or not. We simply have a who, what, when problem that doesn't get them in the door of 9b to even get to the question. First, they have to allege a false representation, and they've alleged that several times in several places. And then, of course, you have to allege reliance. And we have problems on their reliance both with respect to the language, to the medium, and to the documents which they signed. But it's beyond reliance, though, Your Honor. It's who heard which statement, which is beyond reliance. What 9b is there to protect is our ability to examine this complaint and know what it's about without having it sorted out in discovery. And what's notable, if you look at their original brief before the trial court, they said, and this is a direct quote, the amended complaint also alleges that Mr. McAuliffe served as Gulf Coast lobbyist for USCIS. Discovery is needed to determine how much control, if any, Mr. McAuliffe exercised over Gulf Coast. So much of their theory of tying Mr. McAuliffe's liability rests on the role as largest shareholder and chairman. Well, when did being the largest shareholder make you culpable for the statements of a company? Well, I'll bet you Tesla would be interested in that. Well, I'm sure, but 9b was here to protect people in Mr. McAuliffe's position from being hauled through a federal court lawsuit, having their reputation impugned. Well, 9b is, I mean, the answer to what you just said is both true and false. It does protect people in the position of the defendants because fraud can be easily alleged. And you want to make sure that there was a material misstatement made upon which investors or the opposing number relied. So it protects you to that extent. But, well, I've indicated what I think each of you and the points that you're making has less than an airtight case. Yeah, I think, Your Honor, I understand your point again with respect to the statements. Whether or not you found that you find the statements to be true or not true, even before you get to reliance. And there is no evidence of reliance, none. So I don't want to give that point up, but I do want to emphasize that. I think we're all clear about, I mean, you're maintaining that, and this was my frustration when I was trying to parse. I couldn't connect the dots between what was alleged and what was heard. I mean, it really was quite a frustrating exercise. And I think you take the point of some of the questions that it's a problem that could have been nipped in the bud by a little more careful speak to start with. So, Your Honor, I want to address two things that came up during the initial argument that I didn't go to that. The first is that it goes to your point about the perhaps more complete pleading, if possible, might have alleviated some of this, although I am left. Well, the point I was making is the statements that were made. Oh, I'm sorry. I misunderstood that. But I think everybody takes your point. Yeah, okay. Let me address then two points that I just want to address from opening argument. The first is, it is entirely news to me, and I sat there scrambling, flipping through the complaint. There is no allegation that there was a different, that there were a different offering in Chinese. I mean, that is, to say that is not before the court would be an understatement. It's not in the complaint. It was not argued below. That's not in the complaint. It's not in the complaint. It wasn't argued below. It wasn't argued before this court until oral argument just now. So I think that that I don't quite know what to do with. Let me ask you, this is a peculiar circumstance. Here you have a group of obviously wealthy Chinese willing to invest half a million dollars for virtually no return. They're just going to get interest. And they get the EB-5 benefit. And there's a lot of documentation devoted to the EB-5 discussing that. So, I mean, what was the interest rate on this note? I'm not sure it's in the complaint. It's not in the complaint. I looked for it. I didn't see it. There's a note, apparently. There's a loan document. But all the limited partnership was doing was collecting money to lend Green Tech the money to build this plant and to manufacture these MyCars. Correct. And they would get the money back. And, of course, they have a serious interest in knowing about MyCars and Green Tech because they are lending their money. But all they get back as a return is interest. That is correct, Your Honor. I see my time has expired. But obviously the principal inducement was the immigration status. Again, all I have is for purposes of the complaint. I'm sorry. Yes. Thank you, counsel. And now, Ms. Bogler, you've got some response time. Thank you, Your Honor. May it please the Court. May I please quote from paragraph 103 of the complaint, which says that each of the plaintiffs relied on all of the statements in social media, websites, and statements made by Mr. McAuliffe during roadshows and interviews. And the next two paragraphs say the same thing, basically. You have three paragraphs or so saying everybody relied on everything. Yes. And this is all that we are required to allege at this point. Don't you sense that that doesn't say very much? In other words, you allege in one part that there is a CNBC program in Washington where the man is interviewed and he makes a statement. Yes. Now, in paragraph 103, you say everybody relied on that statement. Yes. So it is reasonable to infer that statements in media such as – Now, how many plaintiffs do we have here? I'm sorry? How many plaintiffs? We have 27 plaintiffs. Do all of them – All 27 listened to that program? That's what we allege, Your Honor. And the program – If there is more particularity required, we can add it on the – Just a minute. Just a minute. Follow me. So all 27 listened to this program and relied on it. As far as we know. It was in English, the program, right? That's what we allege. And all the investors spoke Chinese, maybe didn't even speak English some of them, right? Well, you know, I'm originally from another country. No, I'm asking about the – When the news reaches your country, you usually get it in your native language. That's what you hear it in native language. Could you just let people finish their sentences? Oh, I apologize. No, I'm just – you're making allegations that they watched a CNBC program. All of your plaintiffs watched it, and it's programmed in English. You don't allege that it was translated into Chinese or that they heard it in Chinese or when they heard it, when it was retransmitted. And then you don't explain why the documents that they received in connection with the investment didn't totally contradict it. The document talked about the plant being in the development stage that still needed to be designed, had no construction started. And so that clearly contradicts the statement he made. So now you need an explanation as these 27 plaintiffs listening to this CNBC program in English, that was programmed in Washington. They all relied on it and put up $500,000. That's what you're suggesting now? It is reasonable to infer that these statements reach plaintiffs in their native language. We don't allege either way. And this needs to be clarified. We can't. Where do you allege that? We're alleged that they reviewed and relied on these statements. You make the summary statements in paragraphs 103, 4, and 5. But you don't state time, place. You know, 9B requires some particularization. For the statements we do, when they were made, on what day, who made them, this is the who, when, and who. Mr. McCulloch knows when he made his statements and how they were transmitted. But he has no burden here. And I'm a little baffled as to why we're even having this exchange. Do all of the 27 people speak English? They don't. Then that's a remarkable inference that a local television station in Richmond would reach all of Asia and be accessible to an assortment of people who don't speak English. That's not a reasonable. Those statements are also repeated online. Those statements are relayed from one person to another. You don't allege that. We do allege that they were widely distributed online. And they underwent no transmogrification online? That's what it's trying to discover. Extremely, it just viscerates specificity of pleading. No. I'm sorry. I'm just trying to get you to listen to and sort of confront the problem that I went through when I tried to link up what your allegations were with particular statements and particular people. And I had to do that because the allegations in your complaint are so vague, so broad, and so conclusory. I understand the concern, Your Honor. But this complaint needs to be read as a whole. The complaint alleges there was cautionary language in English. Cautionary saying, you know, it's a development company. That was in English. And then defendants went around and made an effort to dissuade those statements in English. And no statement is reasonable to reach plaintiffs in Chinese. And Hitachi says that when you have these contrary misrepresentations, then your investigation requirement, meaning translating this into English, Do you ever allege what McAuliffe said or did that the plaintiffs were exposed to or relied on? It's just everything. At this point, the particularity requirement only requires us to say who, when, and where. We are not required to specify that this plaintiff heard this statement at this Starbucks on this day and this is why he invested. This is not the law in the circuit. That is information. The reliance information is within the control of the plaintiff. Right. Because you would be able to, they can't be expected to say, you know, to prove a negative as easily as you can be expected to include the positive. And the reliance aspect of fraud is within your knowledge and control. And what I think the Supreme Court's decisions in Iqbal and Twombly are saying is that you've got to get, got to plead a plausible claim for relief. And if you say that it suffices for reliance to say that, well, everybody heard everything. That, it seems to me, could lead to simply conclusory and boilerplate allegations. That's what reliance usually is. That's what the cases say, that it's a factual question of whether a plaintiff actually relied. But for purposes of the pleading, reliance allegations are usually conclusory. What can you say? I relied. I didn't rely. There's not much more that you can provide at that point. Oh, sure you can. You can say Mrs. Jones watched this program and was impressed by it and invested based on it. If this is what is required, we will interview plaintiffs further through interpreters and add additional detail to this complaint. It should not have been dismissed without leave to amend so hastily. We should have been given another opportunity to provide further particularity if it was required because the law in the circuit doesn't make it that clear that you are required to connect each plaintiff to each statement and allege where they were and how they heard it and how they relied. How they relied? They approved their families. They moved to this country. They invested into this program. They were guaranteed visas and permanent residency. They took specific actions, and case law says that how you allege reliance specifically, you list specific actions that you took in reliance on the statements, and this is exactly what we've done here, Your Honor. Can we assume that they understood the documents that they signed? Shouldn't we infer that because they signed the documents? What we know is that they relied on the contrary oral statements and believed them, that everything was great, that the cards were being made, that there's so many employees. Ma'am, that doesn't answer my question. Do we infer that when they signed these documents they knew what was in them? Yes. Yes, we can infer that, but then there was cautionary language in those documents just saying, oh, it's a new company. Which came first? So their first was investment, but there were statements before the investment and after the investment. And at what point did they sign the private placement? There were statements before and after. In the context of the language that you're saying soothed them, did it become – it would be relevant to know whether it came before they were aware of what was in the placement memorandum or not. There were statements that we alleged that were made before the investment and after the investment. Which was which? Inducing allegations that we alleged and concealing allegations that we alleged. And the inducing allegations, which is the one you are talking about, you're saying they preceded? Well, you did say that. You said they were preceded signatures. Yes. And it was the concealing. It was both. Well, that's not what you just said. Well, this is what the defendants did. This was not the first wave of investors. This was a third or fourth wave. So they heard statements saying we're making cars and we have employees. Then they invested. And then there were a constant stream of comforting words saying don't worry about these government investigations. Don't worry about those litigations. Everything is okay. Just relax. And those constant stream of comforting words is enough to assume reasonable reliance at this stage according to the Fourth Circuit law. Well, how do we take, if you're right about that, how do we take the role of the documentation? I mean, why do we have a prospectus offering memorandum in a limited partnership agreement? You know, those are binding documents. But when you have contrary oral representations, then Hitachi says— They're not even admissible in evidence, are they? Contrary oral? Contrary oral misrepresentations. I mean, at this point, at the pleading stage, I'm not sure that we should address the disability. The question, the document, it's not just reliance. It is reasonable reliance. Right. And I think that what some of the questions of the panel want is whether it's a reasonable reliance not to have had the documents translated or not to have read the documents or done some investigation. And Hitachi addresses that. There's an exception to reasonable reliance requirement when we have contrary stream of comforting words. Hitachi and Bank of Montreal say you don't need, under Virginia law, you don't need reasonable reliance in that state when you have contrary oral misrepresentations varying what was in the written disclosure. All right, counsel, we appreciate very much your argument. We will come down and— Thank you, Your Honor. —greet counsel, and then we will adjourn court. Thank you.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Allyson K. Duncan